John R. NOVOTNY, Appellant,

v.

GREAT AMERICAN FEDERAL SAV-
INGS & LOAN ASSOCIATION, John A.
Virostek, Joseph E. Bugel, John J. Dra-
vecky, Daniel T. Kubasak, Edward J.
Lesko, James E. Orris, Joseph A. Proko-
povitsh, John G. Micenko and Frank J.
Vanek.

No. 77–1756.

United States Court of Appeals,
Third Circuit.

Argued Feb. 16, 1978.

Reargued May 11, 1978.

Decided Aug. 7, 1978.

Stanley M. Stein, Feldstein, Grinberg, Stein & McKee, Pittsburgh, Pa., for appellant.

Eugene K. Connors, Walter G. Bleil, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellees.

Abner W. Sibal, Gen. Counsel, Joseph T. Eddins, Jr., Associate Gen. Counsel, Charles L. Reischel, Asst. Gen. Counsel, Lutz Alexander Prager, Gary T. Brown, Attys., E. E. O. C., Washington, D. C., amicus curiae.

Argued Feb. 16, 1978

Before SEITZ, Chief Judge, and RO-SENN and GARTH, Circuit Judges.

Reargued May 11, 1978 En Banc

Before SEITZ, Chief Judge, and ALDI-SERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS, GARTH and HIGGIN-BOTHAM, Circuit Judges.

OPINION OF THE COURT

ADAMS, Circuit Judge.

Advocacy of equal rights has seldom been a completely secure vocation. Whether out of fear or for less attractive motives, certain individuals view the advance of equality as a threat to be opposed. Those who take up the cause of equal rights run the risk that their persons and property will suffer the consequences of their opponents' hostility. In days past, this risk exposed individuals to serious harm. Harassment was routine; more serious threats and physical injury were not uncommon. Fortunately, however, such flagrant retaliation has largely subsided. In this case we are called upon to determine whether statutory provisions which did service against the violent assaults on equal-rights advocates in earlier times or other, comparable, legislative enactments can guard against less dramatic retribution.

The precise issue here is whether 42 U.S.C. § 1985(3) and 42 U.S.C. § 2000e (Title VII) protect an employee who claims to have been discharged because his actions and advocacy stood in the path of a plan to deprive women of their equal employment rights.

I. FACTS

John R. Novotny, the plaintiff, began work with Great American Federal Savings and Loan Association (GAF) in 1950. During subsequent years he rose through the ranks to become the Secretary of the company and a member of its board of directors. In the course of his employment, Novotny alleges that he discovered that the individual defendants in this action, officers and board members, "intentionally and deliberately embarked upon and pursued a course of conduct the effect of which was to deny female employees equal employment opportunity." [1]

1. According to the complaint:
Said course of conduct was characterized by some or all of the following actions, *inter alia*:
(a) Promoting male employees with less experience fewer years of service and less qualification over more qualified female employees;
(b) Providing education and training to male employees which was not provided to female employees;
(c) Making known to male employees job vacancies that were not made known to female employees;
(d) Evaluating male employees in accordance with different and subjective criteria than those applied to female employees;
(e) Categorizing certain jobs as "male" or "female" and promoting in accordance with these categories;
(f) Creating an atmosphere inimical to the aspirations of female employees than to male employees;
(g) By providing different and lesser degrees of fringe benefits to female employees than to male employees;
(h) By demoting qualified female employees and replacing them with less qualified male employees.

During the summer of 1974, the GAF board of directors became engaged in a dispute with one Betty Batis, a female employee, who claimed to have been the victim of sex discrimination. According to Novotny's complaint, he took up Batis' cause at a subsequent board meeting and expressed the view that GAF had not met its legal obligations with regard to equal employment opportunity.

The other members of the board voted in January 1975 to terminate Novotny's employment with GAF. On the basis of that termination, Novotny promptly filed an unlawful employment practice charge with the EEOC, and was granted a right to sue letter in December of 1976. Claiming that his dismissal was a reprisal for his advocacy of the cause of equal rights for women in the corporation, Novotny then brought the present action against GAF, officers of the company and individual members of the board of directors.[2] Novotny alleged that the retaliatory discharge imposed upon him constituted an infraction of Section 2 of the Ku Klux Klan Act of 1871,[3] and Title VII of the Civil Rights Act of 1964.[4]

Pursuant to a motion filed under Rule 12(b)(6), the district court dismissed both of Novotny's claims. Because the individual defendants were employees of a single corporation, the trial judge held that they were legally incapable of conspiring in violation of § 1985(3). And, in the court's view, Title VII offered the plaintiff no protection because Novotny had not been discharged as a result of any involvement in a formal EEOC proceeding.

Novotny's timely appeal brought the case before us.

## II. THE CONSPIRACY COUNTS: § 1985(3)

Defendants challenge the plaintiffs' § 1985(3) claim on three grounds. They allege that: (1) as a matter of statutory construction, § 1985(3) confers no redress for grievances such as the one in this case; (2) as a matter of constitutional law, if such redress is provided then § 1985(3) would exceed the powers of Congress; (3) as a matter of definition, officers and directors of a single corporate entity are legally incapable of forming a "conspiracy."

Both in briefs and at oral argument, the parties have occasionally combined discussion of the first and second grounds of objection. However, Congress' intention with respect to the coverage of § 1985(3) is a distinct issue from Congressional power under the Constitution to pass such legislation. Clear analysis therefore requires that the issue of the intended scope of the legislation and its proper construction be examined separately from the question whether such scope is constitutionally authorized. Since defendants' success on the statutory construction issue would obviate the need to explore an unsettled area of constitutional law, we turn first to an examination of the statutory structure.

### A. Background: An overview of the History of § 1985(3)

The statute now codified as 42 U.S.C. § 1985(3) began its existence as a part of

---

**2.** The complaint named John A. Virostek, Chairman of the Board, Joseph E. Bugel, Vice Chairman of the Board, John J. Dravecky, Vice President of GAF; Daniel Kubasak, President of GAF, John Micenko, Treasurer of GAF, Frank Vanek, Controller of GAF, James Orris, former President of GAF, and Joseph Prokopovitsh, a member of the Board of Directors. We were informed at oral argument that a similar sex-discrimination suit is currently pending in the district court on behalf of Ms. Batis.

**3.** 42 U.S.C. § 1985(3) (1970) reads:
If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

**4.** 42 U.S.C. § 2000e et seq. (1970).

Section 2 of the Act of April 20, 1871 (the Ku Klux Klan Act).[5] The 1871 Act was one of several Congressional reactions to the continued violent resistance to Reconstruction in the South.[6] Consideration of the Act was triggered by a message sent to Congress by President Grant on March 23, 1871, warning that "[a] condition of affairs now exits in some States of the Union rendering life and property insecure and the carrying of the mails and the collection of the revenue dangerous," and calling for legislation to remedy this situation.[7] The Congressional response embodied in the 1871 Ku Klux Klan Act included the grant of a civil cause of action against those who deprived persons of constitutional rights under color of state law (later codified as 42 U.S.C. § 1983), the authorization of deployment of federal troops and suspension of habeas corpus in certain situations, and the establishment of criminal penalties for conspiracies to obstruct justice and to interfere with "equal protection" or "equal privileges and immunities." In section 2 of the legislation, the predecessor of § 1985(3), Congress also created a cause of action for persons injured by acts done in furtherance of such conspiracies.

With the cooling of Reconstructionist ardor, the reception accorded to the Ku Klux Klan Act in the courts was not a hospitable one. In *United States v. Harris*,[8] the Supreme Court sustained a demurrer to an indictment, under the Act's conspiracy provisions, of 20 southern whites charged with lynching a black, and declared such criminal penalties unconstitutional as a usurpation of the states' role in protecting liberty and property.

This holding was reaffirmed by *Baldwin v. Franks*,[9] which granted habeas corpus to a member of a group of Californians who had driven resident Chinese aliens out of town in violation of the treaty rights of the Chinese citizens. While conceding that the federal government might have the power to protect treaty rights through criminal sanctions, the Supreme Court held that since the criminal provisions protected *all* privileges and immunities they were invalid.

Following *Harris* and *Baldwin*, Section 2 of the 1871 Act languished largely unused for seventy years.[10] And in 1952, the Supreme Court further cut back on the statute's apparently broad scope in *Collins v. Hardyman*.[11] In response to a claim under the civil conspiracy provisions originally contained in the Act, the Court held that the 1871 Act protected only against deprivations of rights brought about by state

---

**5.** Section 2 as quoted in *Brawer v. Horowitz*, 535 F.2d 830, 837–38, n.15 (3d Cir. 1976) in its entirety is reproduced as appendix I to this opinion.

**6.** *See Monroe v. Pape*, 365 U.S. 167, 177–180, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

**7.** *Id.* 172–73, 81 S.Ct. 473.

**8.** 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290 (1882). *See also United States v. Cruikshank*, 92 U.S. 542, 23 L.Ed. 588 (1875).

**9.** 120 U.S. 678, 7 S.Ct. 763, 32 L.Ed. 766 (1887).

**10.** *See e. g.* Gressman, *The Unhappy History of Civil Rights Legislation*, 50 Mich.L.Rev. 1323 (1952); Note, *Federal Power to Regulate Private Discrimination; The Revival of the Enforcement Clauses of the Reconstruction Era Amendments*, 74 Colum.L.Rev. 449, 451–54 (1974); Note, *The Proper Scope of the Civil Rights Acts*, 66 Harv.L.Rev. 1285, 1286–87 (1953); *Developments in the Law—Section 1983 and Federalism*, 90 Harv.L.Rev. 1133, 1153–1161 (1977).

A sign of possible resurrection appeared in *Hague v. CIO*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), where a divided Supreme Court, relying on the predecessors to § 1983 and § 1985(3), granted relief against discriminatory action by a city to harass political meetings. The Court acted either on the ground that the right to assemble and discuss matters relating to national issues (here the NLRA) was a privilege and immunity of national citizenship (opinion of Justice Roberts) or on the ground that the action denied equal protection (opinion of Justice Stone). The promise of *Hague* remained largely unfulfilled, however. Moreover, in *Snowden v. Hughes*, 321 U.S. 1, 7, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944), the Supreme Court held that § 1985(3) reached only "intentional or purposeful discrimination between persons or classes;" rather than simply denials of right.

**11.** 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253 (1951).

action.[12] There the matter rested until 1971, when the Supreme Court gave new life to the civil conspiracy provisions of the Ku Klux Klan Act [now recodified as 42 U.S.C. § 1985(3)] in *Griffin v. Breckenridge.*[13]

In *Griffin*, the three black plaintiffs were attacked and beaten on a highway in Mississippi by whites who were under the mistaken impression that their victims were associates of a civil rights worker. The blacks brought suit against their assailants under § 1985(3), claiming to have been deprived of various privileges and immunities under the laws of the United States and the ·State of Mississippi, including the rights of free speech, assembly, association, móvement, liberty and security of their persons. The suit was dismissed in the district court, and on the basis of *Collins* the Court of Appeals reluctantly sustained the dismissal. The Supreme Court, however, reversed.

First the Court explained that the constitutional difficulties which shaped the result in *Collins* twenty years earlier had been dissipated by intervening cases. It then held that, at least in a situation where the right to interstate travel is implicated or where a federal power to abolish the badges and incidents of slavery under the Thirteenth Amendment can be invoked, no state action is required to establish the constitutional power to regulate private activity.[14] The Court proceeded to examine the legislative history of § 1985(3), and, finding no reason to decline to accord the terms of the statute their full sweep, sustained the plaintiffs' claim.

Nonetheless, *Griffin* expressed sensitivity to the potential that the cxpansive syntax of § 1985(3) would give rise to a "general federal tort law." To guard against this possibility, the Court looked to the legislative history, which had stressed the adoption of language regarding *"equal* protection or *equal* privileges and immunities" as a limitation on the reach of § 1985(3).[15] Read in light of this history, the Court suggested a cause of action based on a conspiracy to deprive one of equal protection or equal privileges and immunities requires that there must be some racial, or otherwise class based, invidiously discriminatory animus underlying the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by law to all.[16]

## B. The Reach of § 1985(3)

### (1) Class Based Animus

Despite the broad wording of the statute, the Supreme Court avoided interpreting § 1985(3) as a "general federal tort law . . . by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment."[17] And in § 1985(3) litigation subsequent to *Griffin*, the element of class-based invidiously discriminatory animus has, in the words of one commentator, acted as a "threshold requirement,"[18] screening out a

---

12. *Id.* at 659, 661–62, 71 S.Ct. 937.

13. 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

14. The Court stated that "many of the constitutional problems there perceived [in *Collins*] simply do not exist." 403 U.S. at 96–97, 91 S.Ct. at 1795. Later in the opinion, the Court undertook an analysis of the basis for Congressional power to regulate the conduct at issue. It concluded that Congress was authorized to deal with private conspiracies to assault blacks on the highways both under the enforcement clause of the 13th Amendment, and under the powers of the national government to protect the right of interstate travel. *Id.* 104–106, 91 S.Ct. 1790.

The defendants contend that both of these bases were necessary to the outcome of *Griffin*. Our reading of the case is that the 13th Amendment and the right to travel were alternative rationales. *See id.* at 107, 91 S.Ct. 1790, 1801. ("In identifying these two constitutional sources of congressional power, we do not imply the absence of any other.")

15. *Id.* at 102, 91 S.Ct. at 1798 (emphasis in original).

16. *See id.*

17. *Id.*

18. Note, *Civil Rights—State Action is a Requirement for the Application of § 1985(3) to*

variety of § 1985(3) claims at an early stage.[19]

■ In determining the applicability of § 1985(3) to the case before us, therefore, an initial inquiry must be whether the actions which form the basis for this case are the offspring of a "class-based invidiously discriminatory animus" within the meaning of the *Griffin* test.

### (a) *Women as a class*

#### (i) *Women Were Not Excluded from § 1985(3)*

As an opening thrust, defendants urge that, when read in its historical context, § 1985(3) could not have contemplated punishing conspiracies against women. Therefore, they suggest, sex-based conspiracies cannot form the predicate for a cause of action under § 1985(3).

While some of the individuals who voted for § 1985(3) may not have been sympathetic to equal rights for women,[20] the interpretation of statutes is not, in the face of contrary language, tied to the subjective expectations of particular legislators. The fact is that the wording of § 1985(3) gives no basis for excluding women from its protection—rather, the phrases of the statute are attuned to the evolving ideal of equality.

Section 2 of the Act was cast in general terms; it proscribed conspiracies aimed at depriving "any person or class of persons" of equal protection and equal privileges. The breadth of such language was not adventitious. While the impetus toward enactment of the lineal ancestor of § 1985(3) was supplied by concern regarding violence directed at blacks and Union sympathizers,[21] the bill subsequently enacted contained no such limitations.[22] As Judge Al-

*First Amendment Rights*, 54 N.C.L.Rev. 677, 683 (1977).

19. *E. g. Dacey v. Dorsey*, 568 F.2d 275 (2d Cir. 1978) (individual who sued bar association challenged failure of members of bar association to recuse themselves from his case; no class based discrimination alleged); *Jennings v. Shuman*, 567 F.2d 1213 (3d Cir. 1977) (no class base alleged for malicious prosecution); *Meiners v. Moriarity*, 563 F.2d 343 (7th Cir. 1977) (false arrest suit alleged no class-based animus); *Regan v. Sullivan*, 557 F.2d 300 (2d Cir. 1977) (false arrest suit alleged no class-based animus); *Atkins v. Tanning*, 556 F.2d 485 (10th Cir. 1972) (no class-based animus alleged in false arrest suit); *Phillips v. Intl. Assn. of Bridge Workers*, 556 F.2d 939 (9th Cir. 1977) (dissident union members not a class); *Morgan v. Odem*, 552 F.2d 147 (5th Cir. 1977) ("newcomers" not a class); *Askew v. Bloemker*, 548 F.2d 673 (7th Cir. 1976) (suit for illegal search of home alleged no class-based animus); *McLellan v. Mississippi Power & Light Co.*, 545 F.2d 919 (5th Cir. 1977) (en banc) (bankrupts not a class); *Brawer v. Horowitz*, 535 F.2d 830 (3d Cir. 1976) (no allegation of class-based conspiracy); *Hahn v. Sargent*, 523 F.2d 461 (1st Cir. 1975) *cert. denied* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976) (no class-based animus alleged in attempt to damage political career); *Harris v. Brooks*, 519 F.2d 1358 (1st Cir. 1975) (homeowners affected by zoning changes not a class); *Arnold v. Tiffany*, 487 F.2d 216 (9th Cir. 1973) *cert. denied* 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1974) (newspaper dealers desiring to form a trade association not a class); *Hughes v. Ranger Fuel*

*Corp.*, 467 F.2d 6, 8–10 (4th Cir. 1972) (company's action against environmentalists held a response to individual's actions, not class-based); *Jacobson v. Industrial Foundation*, 456 F.2d 258 (5th Cir. 1972) (applicants for workman's compensation are not a class); *Cf. Downs v. Sawtelle*, 574 F.2d 1 (1st Cir. 1978) slip op. (deaf may not be a class); *See generally* Note, *The Scope of Section 1985(3) Since Griffin v. Breckenridge*, 45 Geo. Wash.L.Rev. 239, 252–58 (1976) (discussing cases); Note, *Private Conspiracies to Violate Civil Rights*, 90 Harv.L.Rev. 1721, 1727–29 (1977) (discussing cases).

20. *Cf. Bradwell v. Illinois*, 83 U.S. (16 Wall.) 130, 21 L.Ed. 442 (1873). Concurring in the decision to uphold the refusal of the Illinois Supreme Court to admit women to its bar, Justice Bradley, joined by Justices Swayne and Field (the other two dissenters in the *Slaughterhouse Cases*) wrote:

> [T]he civil law, as well as nature herself has always recognized a wide difference in the respective spheres and destinies of man and woman. Man is, or should be, woman's protector and defender.

21. *Monroe v. Pape*, 365 U.S. 167, 178, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

22. Congressional Globe, 42d Cong., 1st Sess. (1871) [hereinafter, *Cong. Globe*]. Indeed, in opposition to the Act; Representative Harris admitted, *id.* at 484, that "There is one good feature in this bill; that is, it applies to all." Representative Shellabarger, the Chairman of

disert noted in *Brawer v. Horowitz*,[23] Senator Edmunds, in reporting the amendments of the Ku Klux Klan Act to the Senate, interpreted the Act to command that:

> If . . . it should appear that this conspiracy was formed against a man because he was a Democrat, if you please, or because he was a Catholic, or because he was a Methodist, or because he was a Vermonter . . . this section could reach it.[24]

Consequently, we find it difficult to conclude that Congress affirmatively intended to exclude women from protection. Indeed, the sole specific reference to women that we have been able to discover in the legislative history implies to the contrary. In the debate on the scope of the term "privileges

and immunities," in the proposed § 2 of the 1871 Act, Senator Trumbull sought to prove that the right to vote was not a "privilege or immunity" because women could not exercise the franchise.[25] The burden of his argument seems to have been that women were protected in the enjoyment of rights which could properly be classified as "privileges and immunities" and therefore rights from which women were admittedly excluded could not be "privileges and immunities." The underlying premise of this reasoning was that women are within the reach of § 2.[26] The history of the statute thus leads us to determine that the language of § 1985(3) should not be unnaturally cropped to exclude women from its protection.

Chief Justice Warren wrote in a comparable context:[27]

the House Select Committee which drafted the Ku Klux Klan Act and a prime spokesman for the Bill's proponents in the House, first made this point with relation to its first section, later to become § 1983. *Cong. Globe* at App. 68. He reiterated, however, that "The provisions of the 14th Amendment are wholly devoted to securing the equality and safety of all the people, as is this section, and indeed the entire bill. . . ." *Id.*

23. 535 F.2d 830, 839 (3d Cir. 1976).

24. *Cong. Globe* at 567. *See also Griffin*, 403 U.S. at 102 n.9, 91 S.Ct. 1790, 29 L.Ed.2d 338; Representative Kelley at *Cong. Globe* 339 ("A government that cannot protect the humblest man within its limits, that cannot snatch from oppression the feeblest woman or child is not a government."); Representative Sumner *id.* at 651 ("Let the humblest citizen in the remotest village be assailed in the enjoyment of equal rights, and the nation must do for that humblest citizen what it would do for itself. . . Equality implies universality, and what is universal must be national.").

25. *Cong. Globe* at 576. A similar theory was adopted in *Minor v. Happersett*, 88 U.S. (21 Wall.) 162, 169–70 (1874) upholding a denial of female suffrage. The plaintiff, said the Court

> has always been a citizen from her birth, and entitled to all the privileges and immunities of citizenship. . . . If the right of suffrage is one of the necessary privileges of a citizen of the United States, then the Constitution and laws of Missouri, confining it to men are . . . void.

The Court concluded that voting was not such a privilege or immunity.

26. Our conclusion that women were not excluded from § 1985(3) is buttressed by the interpretation which courts have accorded § 1983. As has been often noted, § 1983 constituted the first section of the Ku Klux Klan Act, which also included the ancestor of § 1985(3). *E. G. Monroe v. Pape*, 365 U.S. 167, 180–81, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), *id.* at 199–202, 81 S.Ct. 473 (Harlan, J., concurring); *id.* at 229–234, 81 S.Ct. 473 (Frankfurter, J. dissenting); *Monell v. Department of Social Services*, 436 U.S. 658, 660, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *Cf. Carey v. Piphus*, 435 U.S. 247, 256 n. 10, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (construing § 1985(3) and § 1983 *in pari materia*). The fact that the Supreme Court has had no difficulty in entertaining claims of sex discrimination under § 1983 makes it difficult to conclude that Congress intended to exclude women from protection under § 2 of the 1871 Act. *E. g. Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) *reversing Walker v. Hall*, 399 F.Supp. 1304, 1306 (W.D.Okla.1975) (relief sought under § 1983).

27. *Hernandez v. Texas*, 347 U.S. 475, 478, 74 S.Ct. 667, 670, 98 L.Ed. 866 (1954) (holding that jury discrimination against Mexican-Americans was equal protection violation). The Congressmen who enacted § 1985(3) were not oblivious to the possibility that altered social circumstances could bring oppression upon new classes in society. *See* Senator Ames, *Cong. Globe* 570: ("Man changes so little in centuries even that political creeds are visited by the same punishments that Christianity received at pagan hands in ages past.").

Throughout our history differences in race and color have defined easily identifiable groups which have at times required the aid of the courts in securing equal treatment under the laws. But community prejudices are not static, and from time to time other differences from the community norm may define other groups which need the same protection.

### (ii) *Discrimination against women is "invidious class-based" discrimination*

█ Although we can ascertain that § 1985(3) was intended to have a rather broad sweep, it is nonetheless difficult to parse the precise dimensions of the "classes" which the Congress sought to protect, for, as the Supreme Court noted in *Tenney v. Brandhove*, "The limits of §§ 1 and 2 of the 1871 statute . . . were not spelled out in debate."[28]

In interpreting the language of the statute, the Supreme Court in *Griffin* said:

> The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.[29]

We need not determine here what classes other than those distinguished by race or gender may be within the ambit of § 1985(3). The Court in *Frontiero v. Rich-*

*ardson*[30] remarked: "Congress itself has concluded that classifications based upon sex are inherently invidious." And in discussing discrimination, the Court pointed out that sex, like race and national origin, is an immutable characteristic determined by the accident of birth and that the sex characteristic frequently bears no relation to ability to perform or contribute to society.[31] Thus, to deprive members of a class founded on gender of equal protection or equal privileges and immunities without any justification is to act in an irrational and odious manner—hence, with an invidiously discriminatory animus.[32]

The principle that individuals should not be discriminated against on the basis of traits for which they bear no responsibility makes discrimination against individuals on the basis of immutable characteristics repugnant to our system.[33] The fact that a person bears no responsibility for gender, combined with the pervasive discrimination practiced against women,[34] and the emerging rejection of sexual stereotyping as incompatible with our ideals of equality[35] convince us that whatever the outer boundaries of the concept, an animus directed against women includes the elements of a "class-based invidiously discriminatory" motivation.

We therefore join the two circuits that have included sex discrimination within the

---

**28.** 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951).

**29.** 403 U.S. at 102, 91 S.Ct. at 1798.

**30.** 411 U.S. 677, 687, 93 S.Ct. 1764, 1771, 36 L.Ed.2d 583 (1973) (plurality opinion).

**31.** *See, e. g., Kahn v. Shevin*, 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974); *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).

**32.** *E. g. Arnold v. Tiffany*, 359 F.Supp. 1034, 1036 (C.D.Cal.), *aff'd on other grounds*, 487 F.2d 216 (9th Cir. 1973), *cert. denied* 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1974) (class of newsdealers who wished to form trade association held not to be a "class" within the meaning of § 1985(3)); *Harrison v. Brooks*, 519

F.2d 1358 (1st Cir. 1975) (class of homeowners adversely affected by zoning change held not to be a "class" within the meaning of § 1985(3)).

**33.** *See e. g., Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 175, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972). *Cf. Murphy v. Mt. Carmel H. S.*, 543 F.2d 1189 (7th Cir. 1976) (suggests that non-union members subject to discrimination cannot constitute a class under *Griffin* because constituency of a union is dependent on circumstances).

**34.** *See e. g. Frontiero v. Richardson*, 411 U.S. 677, 684–87, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973).

**35.** *See e. g. Craig v. Boren*, 429 U.S. 190, 198–99, 97 S.Ct. 451, 50 L.Ed.2d 397 (1977).

categories of animus condemned by §1985(3).[36]

### (b) *Novotny's Standing*

Even if sex discrimination is an "invidious class-based animus" within the intendment of *Griffin* the defendants argue, Novotny has no standing to raise a §1985(3) claim, since as a male, the animus toward females was not directed at him. We believe, however, that this claim is at odds with the statutory language, purpose and legislative history.

Section 1985(3) provides for a cause of action in any instance where "in furtherance of the object of" a proscribed conspiracy an act is done "whereby another is injured in his person or property." By its terms, the statute gives no hint of any requirement that the "other" must have any relationship to the "person or class of persons" which the conspiracy seeks to deprive of equal protection, privileges or immunities.

Nor does the legislative history betray any intimation that a cause of action under §1985(3) presupposes membership in the class against which the conspiracy is directed. As Senator Edmunds stated: "This section gives a civil action to *anybody* who may be injured by the conspiracy." [37] Likewise, the testimony regarding the problems which the Act attempted to solve is replete with references to individuals in situations analogous to that of Novotny. Representative Buckley adverted to the fate of "William C. Luke, an educated man from the North who spoke several languages, and who was an enthusiast on the subject of educating and elevating the colored race." [38] Mr. Luke, apparently a white man, was hanged at midnight by the Ku Klux Klan for his activities. Representative Shellabarger referred to one Mr. Allen, by all indications a white man, who was "shot at and banished for teaching colored children to read," [39] and to Reverend Corless, likewise apparently not a black man, a minister sent from Philadelphia to "preach to the colored men," who was "scourged near unto death." [40] *Id.* Summarizing the activities of the Ku Klux Klan, Representative Perry declared:

> Their operations are . . . directed chiefly against blacks *and against white people who by any means attract attention as earnest friends of the blacks.*[41]

In light of this history, we do not believe that Congress intended to immunize Klansmen when their victims happened to be white. By analogy, members of a conspiracy to deprive women of equal rights are liable under §1985(3) to persons who are injured in furtherance of the object of the conspiracy, whether male or female.

---

**36.** *Conroy v. Conroy,* 575 F.2d 175, at 177 (8th Cir. 1978) (explicitly recognized a sex discrimination claim under §1985(3)). And while in *Cohen v. Illinois Inst. of Technology,* 524 F.2d 818 (7th Cir. 1975), *cert. denied* 425 U.S. 943 (1976) (Stevens, J.), the Seventh Circuit rejected a sex discrimination claim grounded directly on a violation of the Fourteenth Amendment because of a lack of what it regarded as the requisite state action, dicta in subsequent cases consistently list "sex" as a "class" cognizable under §1985(3). *Griffin Meiners v. Moriarity,* 563 F.2d 343, 348 (7th Cir. 1977); *Murphy v. Mt. Carmel High School,* 543 F.2d 1189, 1192 n. 1 (7th Cir. 1976); *Askew v. Bloemker,* 548 F.2d 673, 678 (7th Cir. 1976). *Cf. Girard v. 95th St. & Fifth Ave. Corp.,* 530 F.2d 66 (2d Cir.), *cert. denied* 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976) (dismissing sex discrimination claim on the ground that no conspiracy was present); *Weise v. Syracuse University,* 522 F.2d 397 (2d Cir. 1975) (reversing dismissal of §1985(3) sex discrimination suit for want of state action, but reserving question of whether sex discrimination comes within statute); *Canavan v. Beneficial Finance Corp.,* 553 F.2d 860 (3d Cir. 1977) (reversing on procedural grounds dismissal of sex discrimination suit under §1985(3)); *Doski v. M. Goldseker Co.,* 539 F.2d 1326, 1334 (4th Cir. 1976) (dismissing complaint on statutory preemption grounds); *Baker v. Stuart Broadcasting Co.,* 505 F.2d 181 (9th Cir. 1974) (dismissing sex discrimination claim on the ground that no conspiracy present).

**37.** *Cong.Globe* 568 (emphasis added).

**38.** *Cong.Globe,* App. 192–93.

**39.** *Cong.Globe,* 517.

**40.** *Id.*

**41.** *Cong.Globe* App. 78.

This determination draws further sustenance from the Supreme Court's holding in *Sullivan v. Little Hunting Park*.[42] There the Court summarily determined that a white person expelled from membership in an all-white swimming club for advocating the membership of a black person could maintain an action under § 1982. Despite the fact that § 1982 gave no explicit cause of action to those injured in the course of conduct which it prohibited, the Court said:

> We turn to Sullivan's expulsion for the advocacy of Freeman's cause. If that sanction, backed by a state court judgment, can be imposed, then Sullivan is punished for trying to vindicate the rights of minorities protected by § 1982. Such a sanction would give impetus to the perpetuation of racial restrictions on property. . . . Under the terms of our decision in *Barrows,* there can be no question but that Sullivan has standing to maintain this action.[43]

Given the wording of the statute and the history canvassed above, as well as the Court's pronouncement in *Little Hunting Park,* a similar conclusion follows *a fortiori* in the case before us.

Finally, a close reading of *Griffin* itself compels the conclusion that an action under § 1985(3) need not be predicated on a conspiracy involving invidious animus directed against the plaintiff personally. In *Griffin* the three plaintiffs had ridden to the place where they were attacked in a car owned by R. G. Grady, who was not involved in the suit. The complaint alleged that the assailants were under the mistaken impression that Grady was a civil rights worker. In determining that a cause of action had been made out under § 1985(3), the Supreme Court stated:

> Finally, the petitioners—*whether or not the nonparty Grady was the main or only target of the conspiracy*—allege personal injury resulting from those [conspiratorial] acts.[44]

There is no intimation that, had one of the plaintiffs in *Griffin* been a white civil rights worker, he would have been denied the cause of action which his black compatriots were granted.

Novotny asserts in his complaint that his employment was terminated as a result of his support of equal opportunity claims of the female employees of GAF, "because of his known support for equal employment opportunity for women within the GAF organization", and because he was "in a position to affect (sic) actions and procedures to implement equal employment opportunities for women."[45] Such allegations constitute a sufficient pleading of acts "in furtherance of the object of" a conspiracy to deprive women in GAF of equal employment opportunity so as to entitle Novotny to maintain an action for damages to his person or property resulting from such acts.[46]

---

**42.** 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1970).

**43.** *Id.* at 237. *See Tillman v. Wheaton-Haven Rec. Assn.,* 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973).

The suggestion that to allow non-members of the class standing would set loose a deluge of § 1985(3) claims of the "general tort law" variety is undercut by the experience of this Circuit. In *Richardson v. Miller,* 446 F.2d 1247 (3d Cir. 1971), we reversed the dismissal of a claim by a white employee who allegedly had been fired because of his advocacy of racial equality by his employer. In the seven years since *Richardson* no tide of spurious § 1985(3) litigation has yet engulfed our courts.

**44.** 403 U.S. at 103, 91 S.Ct. at 1799; *cf. Herrman v. Moore,* 576 F.2d 453 (2d Cir. 1978) (Black plaintiff who alleged he had been fired for advocating hiring of blacks brought a § 1985(3) suit. Summary judgment for the defendants was affirmed because insufficient evidence was presented that plaintiff had been discharged because of such advocacy).

**45.** Complaint ¶¶ 24–27.

**46.** It has been suggested that *Cameron v. Brock,* 473 F.2d 608, 610 (6th Cir. 1973) runs counter to the position that we adopt. There the Court recognized a class composed of "supporters of political candidates" for *Griffin* purposes, and stated that "if a plaintiff can show that he was denied the protection of the law because of the class of which he was a member" an action lay under § 1985(3). We understand the Sixth Circuit to have defined a sufficient rather than a necessary condition for a § 1985(3) action. Any other declaration would,

### (2) Equal Privileges and Immunities and Equal Protection

#### (a) The Statutory Scheme

■ Once the existence of class-based invidious animus is established, the boundaries of protection offered by § 1985(3) are traced by the scope of the words, "equal protection of the laws" and "equal privileges and immunities under the laws." These are the two primary interests which the statute purports to guard.[47]

As a result, since the resuscitation of § 1985(3) in *Griffin*, there has been considerable discussion by jurists and scholars as to whether the statute is "substantive" or "remedial," and if "remedial," for which rights it provides remedies.[48] While we

---

of course, have been dictum. Likewise, the comment of the Seventh Circuit in *Meiners v. Moriarity*, 563 F.2d 343, 348 (7th Cir. 1977) that plaintiff did not allege "that he belongs to the kind of class . . . that could support a claim under § 1985(3)" seems best interpreted as a definition of the type of class which can be the target of a § 1985(3) conspiracy rather than a statement about standing, particularly since that Circuit carefully reserved the issue of how close a connection between the plaintiff and the class of conspiracy victims was required under § 1985(3) in *Murphy v. Mt. Carmel H. S.*, 543 F.2d 1189, 1192 (7th Cir. 1976).

The "in furtherance of" language of the statute seems to require some degree of relationship between the act done and the object of the conspiracy. We do not determine, however, how close such nexus must be to support a § 1985(3) claim.

**47.** It could be argued that because the phrases track the 14th Amendment's guarantees, the construction of the 14th Amendment's language should govern the guarantees of § 1985(3). *See Bellamy v. Mason's Stores Inc.*, 508 F.2d 504, 507 (4th Cir. 1974). Such a conclusion may be unwarranted. First, with respect to the privileges and immunities clause, the language of § 1985(3) is broader than that contained in the 14th Amendment. Because it shields against state abridgement the "privileges or immunities of citizens of the United States", the 14th Amendment has been held to secure *only* the privileges and immunities of national citizenship as opposed to state citizenship. This interpretation in turn has been construed to exclude "basic" rights said to attach to state citizenship from protection of the 14th Amendment. *See e. g. Madden v. Kentucky*, 309 U.S. 83, 90–91, 60 S.Ct. 406, 84 L.Ed. 590 (1940); *Hague v. CIO*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); *Twining v. New Jersey*, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908); *Hodges v. United States*, 203 U.S. 1, 15–16, 27 S.Ct. 6, 51 L.Ed. 65 (1906); *United States v. Cruikshank*, 92 U.S. 542, 23 L.Ed. 588 (1875); *Slaughterhouse Cases*, 83 U.S. [16 Wall.] 36, 72–82, 21 L.Ed. 394 (1872). *See generally United States v. Williams*, 341 U.S. 70, 71 S.Ct. 581, 95 L.Ed. 758 (1951) (opinion of Frankfurter, J.). In contrast, the language of § 1985(3) reads, "privileges and immunities under law."

Second, while the 14th Amendment is on its face directed against state denials of equal protection and deprivations of liberty and property, the Supreme Court has established that, in accordance with its language, § 1985(3) applies to private as well as public action. *Griffin*, 403 U.S. at 96–101, 91 S.Ct. 1790. As a result, canons of construction developed to delimit the reach of the 14th Amendment prohibitions may not be appropriate guides to ascertaining the range of § 1985(3).

Moreover, § 1985(3), enacted eight years after passage of the 14th Amendment, has a legislative history of its own which may well cast different light on its meaning than that surrounding the adoption of the 14th Amendment. *Cf. Griffin*, 403 U.S. at 104–05, 91 S.Ct. 1290 (holding that certain applications of § 1985(3) are authorized by the 13th Amendment).

**48.** *E. g. compare Action v. Gannon*, 450 F.2d 1227 (8th Cir. 1971) (en banc) (protecting freedom of religion); *Means v. Wilson*, 522 F.2d 838 (8th Cir. 1975) *cert. denied* 424 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364 (1976) (protecting right to vote); *Richardson v. Miller*, 446 F.2d 1247 (3d Cir. 1971) (protecting free expression) *with Cohen v. Illinois Inst. of Technology*, 524 F.2d 818 (7th Cir.) *cert. denied* 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976) (sex discrimination not actionable under 14th Amendment and § 1985(3)); *Bellamy v. Mason's Stores, Inc.*, 508 F.2d 504 (4th Cir. 1974) (free association not protected); *McLellan v. Mississippi Power & Light Co.*, 545 F.2d 919 (1977) (en banc) (only independently illegal acts deprive of equal protection not reaching scope of privileges and immunities). *See generally Lopez v. Arrowhead Ranches*, 523 F.2d 924 (9th Cir. 1975). *And compare, e. g.*, Note, *Private Conspiracies*, *supra* note 19 (arguing that restriction to remedying independently illegal actions is "formalistic and over-restrictive" but suggesting that statute should exempt "areas of private choice that should remain autonomous"); Note, *The Supreme Court 1970 Term*, 85 Harv.L.Rev. 3, 99–101 (areas covered by § 1985(3) are "uncertain," suggesting limitation of protection to guarantees of Bill of Rights) *with* Note, *The Scope of Section 1985(3)*, *supra* note 19 at 242–251 (arguing that § 1985(3) should be limited to providing a remedy for

have no occasion to undertake to review the entire debate, certain observations frame our discussion here.

It seems that § 1985(3) is not to be read as a general charter to federal courts to set codes of conduct wherever "equality" of any class is allegedly infringed. The reluctance to trigger the development of such a "general federal tort law" formed the backdrop of the Supreme Court's discussion in *Griffin*,[49] and properly so in light of the statutory language contained in § 1985(3) as well as its legislative history.

The passage, "of depriving . . . equal protection *of the laws,* or of equal privileges and immunities *under the laws,*"[50] connotes the existence of laws outside of § 1985(3) which define the "protection" and "privileges and immunities" that are guaranteed against invasion.[51] This connotation is confirmed by our reading of the debates surrounding the adoption of § 1985(3). Most of the proponents of the Ku Klux Klan Act explicitly viewed it as protecting rights conferred by sources other than the Act itself.[52] Indeed, Senator Edmunds, the floor manager of the bill in the Senate, explicitly stated:

> All civil suits which this Act authorizes, as every lawyer understands, are not based on it, they are based on the rights of the citizen. The Act only gives a remedy.[53]

Similarly, in describing the conspiracies actionable under § 1985(3), the Supreme Court in *Griffin* said:

> The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights *secured by the law* to all.[54]

Whatever else "equal privileges and immunities" or "equal protection" may mean, in the context here, we conclude that a deprivation of equal privileges and immunities under § 1985(3) includes the deprivation of a right secured by a federal statute guaranteeing equal employment opportunity.

This is not to say, however, that the object of the conspiracy must necessarily be independently illegal, or that the law conferring a right must by its own force secure it against private action.[55] For the statute proscribes conspiracies to deprive persons or

---

independent federal rights); Note, *Federal Power to Regulate, supra* note 10 at 497–98 (suggesting statute should be read as "remedial"). *See also* n. 61 *infra.*

**49.** 403 U.S. at 102, 91 S.Ct. 1790. *Cf. Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Senator Trumbull, Cong. Globe* 580 ("quite well satisfied" that intent of § 2 was not "to enter the States to pass a general criminal code for the State, or a general law for the redress of civil injuries").

**50.** 42 U.S.C. § 1985(3) (Emphasis added).

**51.** *Cf. McClellan v. Mississippi Power & Light Co.,* 545 F.2d 919, 924–28 (5th Cir. 1977) (*en banc*) (reaching a conclusion that the object of conspiracy must be independently illegal, on the basis of dicta in *United States v. Harris,* 106 U.S. 629 (1882)).

**52.** *See, e. g.,* Senator Edmunds, *Cong.Globe* 567 ("Constitutional rights"), 568 ("Constitution and Laws of the United States"), 568, 581 ("equal protection of the laws of the United States"); Representative Cook, *id.* at 485 ("where Constitution of the United States secures a right to a citizen"); Representative Shellabarger, *id.* at 382 ("laws of the United States and constitution thereof") App. 113

("constitutional or statutory law"); Representative Hawley, *id.* at 383 (*semble); cf.* Senator Thurman, *id.* App. 218 (arguing that "laws" must be laws of the United States, since otherwise Congress has no power to punish violations"). *But cf.* Representative Shellabarger, *Cong.Globe* at App. 69 (suggesting that § 2 protects "those privileges and immunities which are in their nature fundamental and which inhere and belong of right to citizens of all free governments"); Representative Sumner, *id.* at 651 ("rights national in character").

**53.** *Cong.Globe* at 568.

**54.** 403 U.S. at 102, 91 S.Ct. at 1798. *See id.* 103, 91 S.Ct. 1790, 1799 ("animus to deprive the petitioners of the equal enjoyment of legal rights" is requisite of a § 1985(3) claim); *id.* at 105, 91 S.Ct. at 1800 ("Congress may protect blacks against conspiracies depriving them of the basic rights that the law secures to all free men").

*See The Supreme Court, 1970 Term,* 85 Harv. L.Rev. 3, 99 (1971).

**55.** Our analysis thus diverges from that adopted by the Fifth Circuit in *McLellan v. Mississippi Power and Light Co.,* 545 F.2d 919, 924–28 (5th Cir. 1977) (*en banc*).

classes of persons of legal rights "directly or indirectly." And, as Judge Learned Hand said of another section of the Ku Klux Klan Act securing federal privileges, "it would emasculate the act either to deny protection against reprisal to those whom threats did not deter, or to leave without recourse those who were later made victims of reprisals of which they had not been warned."[56]

Thus § 1985(3) may not be construed as a warrant to impose wide-ranging new duties upon private individuals in the interests of abstract equality. Yet it must be remembered that the Act was broad-gauged legislation designed to provide additional remedies for actions threatening the enjoyment of important rights. As a draftsman of the Act expressed the intent:

> This Act is remedial and in aid of the preservation of human liberty and human rights. All statutes and constitutional provisions authorizing such statutes are liberally construed . . . [and] the largest latitude consistent with the words employed is uniformly given in construing such statutes. . . .[57]

**56.** *Bomar v. Keyes,* 162 F.2d 136, 139 (2d Cir.), cert. denied 332 U.S. 825, 68 S.Ct. 166, 92 L.Ed. 400 (1947) (L. Hand, J. for Swan and Clark, JJ.) (holding that termination of probationary teacher in retaliation for voluntary decision to serve on a federal jury would "deprive" her of a "right or privilege at stake was secured by a 'law' of the United States" in violation of § 1983). *See United States v. Waddell,* 112 U.S. 76, 5 S.Ct. 35, 28 L.Ed. 673 (1884) (interference with privilege to establish homestead on federal land actionable under § 241, despite the fact that statute granting privilege did not explicitly protect the homesteader against private action).

The position that rights created between the citizen and the Federal Government entail a concomitant obligation of private parties not to interfere with receipt of benefits under or the exercise of such rights was ably expounded by Professor Cox in *Foreward: Constitutional Adjudication and the Promotion of Human Rights,* 80 Harv.L.Rev. 91, 110–115 (1966).

**57.** Representative Shellabarger, *Cong.Globe* App. 68 (introducing Ku Klux Klan Act.)

**58.** Complaint ¶¶ 17–21. *See* n. 1 *supra.*

**(b)** *Equal Protection Privileges and Immunities in this case*

 Here, as noted above, the plaintiff alleged a concerted course of conduct on the part of individual defendants of "intentionally and deliberately . . . denying to female employees equal employment opportunity," in various specified respects.[58] Novotny further pleaded that in retribution for his support of equal employment opportunities for women within the GAF organization, the individual defendants, acting in concert, caused his employment with GAF to be terminated. Taking his averments as true—as on a Rule 12(b)(6) motion we must[59]—Novotny has made out a case that he has been injured by acts done in furtherance of a conspiracy proscribed by § 1985(3).

The conspiracy alleged had as its goal the denial of job equality for women, in direct violation of federal law guaranteeing this basic and important right.[60] And at least a coadunation to deprive female employees of the basic right of equal opportunity in contravention of federal law would fall squarely within the statute's prohibition of conspiracies to abridge equal privileges and immunities.[61]

**59.** *See e. g. Jenkins v. McKeithen,* 395 U.S. 411, 416, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *Conley v. Gibson,* 355 U.S. 41, 45–48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

**60.** 42 U.S.C. § 2000e–2(a)(1) makes it an unlawful employment practice for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."

Similarly, 43 P.S. § 955(a) under Pennsylvania law makes it unlawful for any employer "because of . . . sex . . . to otherwise discriminate against [and] individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment." Moreover, the individual conduct which Novotny alleges might also violate 43 P.S. § 955(e) which prohibits "any person, whether or not an employer . . . or employe, to aid, abet, incite, compel or coerce" a violation of § 955(a).

**61.** As noted above, n. 47 *supra,* unlike the 14th Amendment, § 1985(3) does not appear to limit its protection to the privileges and immunities of United States citizens. But the legislative

While the Congress in 1871 could not have specifically contemplated a federal statute that was not enacted until almost a century later, as a matter of ordinary language the words of § 1985(3) clearly embrace a statutorily provided right of equal employment opportunity within the rubric "equal privileges and immunities under the laws." As the Court said in *United States v. Price*,[62] regarding 18 U.S.C. § 241, the "closest remaining criminal analogue to § 1985(3)": [63]

> The language . . . is plain and unlimited. As we have discussed, its language embraces all of the rights and privileges secured to citizens by *all* of the Constitution and *all* of the laws of the United States. There is no indication in

the language that the sweep of the section is confined to rights that are conferred by or "flow from" the Federal Government, as distinguished from those secured or confirmed or guaranteed by the Constitution.

Nor does the legislative history of the Ku Klux Klan Act weaken the implication of the statutory language that rights conferred by at least some federal statutes fall within the definition of "equal privileges and immunities." [64] Congressman Shellabarger, the Act's prime legislative engineer, described § 2, from which § 1985(3) is derived as "providing for the punishment of any combination or conspiracy" impinging on basic rights protected by law.[65] And

---

history is not pellucid. *Cf. e. g.* Representative Cook, *Cong.Globe* 486 (suggesting "force, fraud or intimidation" would violate statute); Senator Edmunds, *id.* 580 (equal protection of "state laws"); *with e. g.* Senator Thurman, *id.* App. 218 (only national laws can be enforced by Congress); Senator Sumner, *id.* 651 (rights protected should be national rights so that protection will not be "accident of local law").

In his complaint, Novotny claimed that the retaliation for his support of women abridged his First Amendment rights, in violation of § 1985(3). *Cf. Richardson v. Miller*, 446 F.2d 1247 (3d Cir. 1971).

Since we find the requisite allegations of a conspiracy to deny equal privileges and immunities in the pleading regarding sex discrimination, we need not resolve the question whether a class-based conspiracy to injure an individual for the exercise of First Amendment rights would state a cause of action under § 1985(3). *Compare Tyler v. "Ron"*, 574 F.2d 427 (8th Cir. 1978) (interference with constitutional right would state a § 1985(3) cause of action); *Action v. Gannon*, 450 F.2d 1227, 1235 (8th Cir. 1971) (en banc) (private interference with freedom of religion states a cause of action); *Westberry v. Gilman Paper Co.*, 507 F.2d 206 (5th Cir. 1975) *withdrawn as moot* 507 F.2d 216 (en banc) (firing employee for political activities made out § 1985(3) claim); *Means v. Wilson*, 522 F.2d 833 (8th Cir. 1975) (conspiracy to deny right to vote in tribal elections states a § 1985(3) claim) *cert. denied* 424 U.S. 958 (1976) *with Murphy v. Mt. Carmel H. S.*, 543 F.2d 1189 (7th Cir. 1976) (First Amendment right to free speech not protected); *Bellamy v. Masons Stores, Inc.*, 508 F.2d 504 (4th Cir. 1974) (right of association not protected); *McLellan v. Mississippi Power & Light Co.*, 545 F.2d 919, 925–26 n. 22 (5th Cir. 1977) (en banc) (right to file bankruptcy petition not protected). *See also Cameron v. Brock*, 473 F.2d 608 (6th

Cir. 1973) (conspiracy by sheriff to harass political opponents states § 1985(3) claim).

We note, however, that insofar as the reluctance to recognize a cause of action for First Amendment rights is based on a supposed want of Congressional power, such reasoning is less forceful here. It has been held that the right to speak on issues regarding the national government is a right and privilege of national citizenship protectable under the 14th Amendment and Congress' inherent powers. *Hague v. CIO*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) (opinion of Roberts, J.); *see United States v. Cruikshank*, 92 U.S. 542, 552, 23 L.Ed. 588 (1875). *See also* n. 109 *infra* (right to persuade others to comply with federal law may be privilege of national citizenship).

**62.** 383 U.S. 787, 800, 86 S.Ct. 1152, 1160, 16 L.Ed.2d 267 (1966).

**63.** This characterization was contained in *Griffin*, 403 U.S. at 98, 91 S.Ct. at 1796.

> Enacted a year before the Ku Klux Klan Act, § 241 makes it a federal crime to:
>
> conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same . . . . .

**64.** Inasmuch as we are concerned here only with a federal statute securing a right to equal employment opportunity, which we hold to be within the ambit of § 1985(3)'s "equal privileges and immunities," we have no occasion to determine whether rights secured by all federal statutes or by state law come within § 1985(3)'s "privileges and immunities."

**65.** *Cong.Globe* at 382 (conspiracy to "deprive a citizen of the United States of such rights and

Senator Edmunds stated that § 2 mandated punishment for acts done in pursuance of "a conspiracy to deprive the citizens of the United States, in the various ways named, of the rights which the Constitution and laws of the United States made pursuant to it give them." [66]

The conclusion that rights conferred by at least some federal statutes fall within the ambit of "equal privileges and immunities under the laws," which § 1985(3) protects, is also amply supported by relevant precedent. A number of courts of appeals have determined that a deprivation of certain statutory rights gives rise to a cause of action under § 1985(3).[67] Moreover, in cases regarding statutes cognate to § 1985(3), the Supreme Court has held that "privileges and immunities" include federal statutory rights.[68]

In *United States v. Johnson,*[69] the Supreme Court reviewed the application of § 241,[70] which protects the "free exercise or enjoyment of any right or privilege secured by the Constitution and laws of the United States," to a "conspiracies by outside hoodlums to assault Negroes for exercising their right to equality in public accommodations under § 201 of the Civil Rights Act."[71] The Court had little trouble in concluding that "the right to service in a restaurant is such a 'right', [under § 241] at least by virtue of the 1964 Act".[72] Similarly, almost a century earlier, in *United States v. Waddell,*[73] the Supreme Court was faced with a combination to drive a homesteader off federal land upon which he was attempting to establish a claim pursuant to statutory procedures. Such acts "to prevent or throw obstruction in the way of exercising such statutory rights" were held to constitute a conspiracy to impair federal rights which could be attacked under § 241.

Similar light is cast by the interpretation of § 1983, formerly § 1 of the Ku Klux Klan Act of 1871.[74] In *City of Greenwood v.*

immunities as he has by virtue of the *laws of the United States* and the Constitution thereof"). (emphasis added). *See* the remarks of Congressman Shellabarger at *id.* 517 (the goal of the Ku Klux Klan "is to trample into the dust the newly acquired political rights of the freeman and the Constitution and laws which confer them);" *id.* app. 113 (the gist of the offense under section 2 is "in the conspiracy to defeat United States Law made in protection of the *fundamental rights of national citizenship,* whether that law be Constitutional or statutory law").

**66.** *Cong.Globe* 568. *See e. g. id.* at 383 (Rep. Hawley) (law should reach those who "stand in the way of the exercise by this man of the rights and privileges *to which he is clearly entitled under the constitution and laws of the United States*"); *id.* pp. 188 (Rep. Willard) (bill covers "rights, privileges and immunities of any person to which he is entitled under the Constitution and laws of the United States"). *Id.* 579 (Sen. Trumbull) (bill protects "persons in the rights which were guarantied (sic) them by the Constitution and laws of the United States . . . .") *Quoted* in *Monroe v. Pape,* 365 U.S. 167, 181, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

**67.** *Marlowe v. Fisher Body,* 489 F.2d 1057 (6th Cir. 1973); *Lopez v. Arrowhead Ranches,* 523 F.2d 924 (9th Cir. 1975) (by implication); *Doski v. M. Goldseker Co.,* 539 F.2d 1326 (4th Cir. 1976) (by implication); *Taylor v. Nichols,* 558 F.2d 561, 571 (10th Cir. 1977); *Local No. 1 v.*

*Intl. Brotherhood of Teamsters, etc.,* 419 F.Supp. 263, 275–77 (E.D.Pa.1976); *Beamon v. Saunder & Co.,* 423 F.Supp. 1167, 1177 (E.D.Pa. 1976); *Milner v. Ntl. School of Health Tech.,* 409 F.Supp. 1389, 1395 (E.D.Pa.1976). *Cf. Cohen v. Ill. Inst. of Technology,* 524 F.2d 818, 828 (7th Cir. 1975), *cert. denied* 425 U.S. 943 (1976) ("a federally protected right").

**68.** While, for the reasons noted above, n. 47 *supra,* we are reluctant to reason closely from analogies to the 14th Amendment privileges and immunities clause, it is to be observed that in the *Slaughterhouse Cases,* 83 U.S. (16 Wall.) 36, 79 (1883), the Court said that national privileges or immunities were those "which owe their existence to the Federal government, its national character, its Constitution, *or its laws."* (emphasis added).

**69.** 390 U.S. 563, 88 S.Ct. 1231, 20 L.Ed.2d 132 (1968).

**70.** See note 63 *supra.*

**71.** 390 U.S. at 563, 88 S.Ct. at 1232.

**72.** *Id.* at 565–66, 88 S.Ct. at 1233.

**73.** 112 U.S. 76, 5 S.Ct. 35, 28 L.Ed. 673 (1884).

**74.** The legislative history reveals that the Congress was also cognizant of the relationship between the scope of § 1985(3) and § 241.

*Peacock,* the Supreme Court stated that under § 1983 "officers may be made to respond in damages . . . for violations of rights conferred by federal equal civil rights laws (sic)," and a number of Circuits have acknowledged that suits for such statutory violations are proper.[75]

Having held that at least some federal statutory rights can form the predicate for a suit under § 1985(3), we conclude that Novotny, in alleging the existence of a conspiracy to violate the equal employment rights of female employees in contravention of Title VII, has adequately pleaded the existence of conspiracy to deprive a class of persons of equal privileges or immunities under the laws.

### (c) *Conflict with Title VII*

The defendants suggest that even if § 1985(3) provides a remedy for conspiracies to impair statutorily-conferred rights as a general matter, a § 1985(3) action to redress conspiracies to violate Title VII rights would be inconsistent with the administrative mechanism established by the latter Act. In support of this proposition, they cite the Fourth Circuit's holding in *Doski v. Goldseker.*[76]

In *Doski,* a female employee brought suit alleging sex discrimination violative of both Title VII and § 1985(3). The court held the Title VII remedy to be the exclusive means of vindicating statutory rights, since the availability of § 1985(3) would allow a plaintiff to by-pass the administrative procedures provided by Title VII. *Doski* read those parts of the legislative history of Title VII approving overlap between Title VII and other Civil Rights Act remedies to refer only to vindication of "federal right [which existed] prior to the enactment of Title VII." [77]

At least one court of appeals has apparently reached a conclusion contrary to that of the Fourth Circuit. In *Marlowe v. Fischer Body,*[78] the Sixth Circuit reversed the dismissal of a complaint which alleged employment discrimination based on religion and national origin. Although the complaint contained counts based on Title VII and the NLRA, in addition to § 1985(3), the Sixth Circuit reversed the dismissal on all counts.[79]

■ We find the result reached in *Marlowe* to be better grounded in history and precedent than that in *Doski.* On its face § 1985(3) makes no distinction among federal privileges and immunities depending on the date of the enactment of laws securing them. As noted above, the language seems to protect *all* such privileges and immunities. Indeed, in describing the bill, Senator

---

**75.** 384 U.S. 808, 829, 86 S.Ct. 1800, 16 L.Ed.2d 944. *See, e. g. Chase v. McMasters,* 573 F.2d 1011 (8th Cir. 1979); *Sanders v. Conine,* 506 F.2d 530 (10th Cir. 1974); *Blue v. Craig,* 505 F.2d 830 (4th Cir. 1974); *Gomez v. Florida State Employment Service,* 417 F.2d 569 (5th Cir. 1969); *Bomar v. Keyes,* 162 F.2d 136 (2d Cir.), *cert. denied,* 332 U.S. 825, 68 S.Ct. 166, 92 L.Ed. 400 (1947) (L. Hand, J.); *LaRaza Unida v. Volpe,* 440 F.Supp. 904 (N.D.Cal.1977). *Cf., e. g., Eisen v. Eastman,* 421 F.2d 560 (2d Cir. 1969) *overruled Lynch v. Household Finance Corp.,* 405 U.S. 538, 542, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1975) (§ 1983 does not protect property rights); *Andrews v. Maher,* 525 F.2d 113 (2d Cir. 1975) (no jurisdiction under 28 U.S.C. § 1343(3) to hear § 1983 challenge to deprivation based on welfare statute). *Randall v. Goldmark,* 495 F.2d 356 (1st Cir.), *cert. denied* 419 U.S. 879, 95 S.Ct. 144, 42 L.Ed.2d 119 (1974) (*semble* ).

Representative Willard, *Cong.Globe* 189 app.; Representative Shellabarger, *id.* 68 app.

The conclusion that § 1983 and § 1985(3) may both provide causes of action for deprivation of statutory rights is not undercut by the reasoning of *Gonzalez v. Young,* 560 F.2d 160 (3d Cir. 1977), *cert. granted* 434 U.S. 1061, 98 S.Ct. 1232, 55 L.Ed.2d 761 (1978).

**76.** 539 F.2d 1326 (4th Cir. 1976). *Cf. Schatte v. International Alliance,* 182 F.2d 158 (9th Cir. 1950) (no § 1983 suit for rights protected by NLRA; NLRA remedies held exclusive).

**77.** 539 F.2d at 1334.

**78.** 489 F.2d 1057 (6th Cir. 1973).

**79.** *See Milner v. Natl. School of Health Tech.,* 409 F.Supp. 1389 (E.D.Pa.1976) (recognizing claim for sex discrimination violating Title VII under § 1985(3)). *Cf. Weise v. Syracuse University,* 522 F.2d 397, 408–409 n. 16 (2d Cir. 1975) (reserving issue of possible conflict between Title VII and § 1985(3)).

Edmunds stated that it reached "conspiracies to deprive people of the equal protection of the laws, *whatever those laws may be.*" [80]

Thus, if rights protected by Title VII are to be excluded from the scope of § 1985(3), such result must flow from the fact that Title VII worked a partial repeal of § 1985(3), although § 1985(3) was not mentioned by the later legislation. Such repeals by implication are, of course, not favored. In *Runyon v. McCrary,* [81] the Supreme Court recently reiterated, in reference to § 1981, the rule that implied repeals occur only if the two legislative acts in question are in irreconcilable conflict. [82] Given the legislative history of Title VII and its construction by the Supreme Court, we discern no such conflict here.

As the Supreme Court observed in *Alexander v. Gardner-Denver Co.,* [83] the Senate defeated an amendment which would have made Title VII the exclusive federal remedy for most unlawful employment practices, and a similar amendment was rejected in connection with the Equal Employment Opportunity Act of 1972. Indeed, the Supreme Court noted in *Runyon* [84] that Senator Williams, floor manager of the 1972

Act, argued in opposition to the amendment that "it is not our purpose to repeal existing civil rights laws," and specifically stated that:

> The law against employment discrimination did not begin with Title VII and the EEOC, nor is it intended to end with it . . . the courts have specifically held that Title VII and the Civil Rights Acts of 1866 and 1871 are not mutually exclusive, and must be read together to provide alternative means to redress individual grievances. [85]

Such statements are not isolated remarks. After reviewing the legislative history of Title VII, the Supreme Court in *Johnson v. REA* concluded:

> Despite Title VII's range and its design as a comprehensive solution for the problem of invidious discrimination in employment, the aggrieved individual clearly is not deprived of other remedies he possesses and is not limited to Title VII in his search for relief. [86]

In view of this holding, and of the generally favorable reception which the Supreme Court has extended to Reconstruction Act litigation dealing with subjects also covered by later civil rights enactments, [87] we con-

---

**80.** *Cong.Globe* 568.

**81.** 427 U.S. 160, 173 n. 10, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976).

**82.** *Cf. Sullivan v. Little Hunting Park,* 396 U.S. 229, 237, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) (§ 1982 is not repealed by 1964 Civil Rights Act, because the later Act is "not at war" with the principles embodied in § 1982).

**83.** 415 U.S. 36, 48 and n. 9, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

**84.** 427 U.S. at 174 n. 11, 96 S.Ct. 2586.

**85.** 118 Cong.Rec. 3371 (1972).

**86.** 421 U.S. 454, 459, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). *See Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 48, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). The Court in *Johnson* also explicitly considered and rejected the contention that litigants under § 1981 should be required to follow Title VII's administrative procedures before being permitted to litigate. 421 U.S. at 461.

The argument that § 1985(3) actions founded on Title VII rights need not defer to the proce-

dures specifically provided for the vindication of Title VII rights is somewhat weaker than that for the independence of § 1981. Unlike § 1981, § 1985(3) is not specifically mentioned in the debates on Title VII, and § 1985(3) is more intimately linked to Title VII. On the other hand, in this case, the EEOC, which is entitled to some deference in such matters, *see, e. g., Zuber v. Allen,* 396 U.S. 168, 192–94, 90 S.Ct. 314, 24 L.Ed.2d 348 (1969); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), has argued for the availability of a § 1985(3) action to vindicate Title VII rights.

In any event, in that the plaintiff here properly exhausted his remedies under Title VII, we need not resolve the issue.

**87.** *See Sullivan v. Little Hunting Park,* 396 U.S. 229, 237, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) (§ 1982 and Fair Housing Act); *United States v. Johnson,* 390 U.S. 563, 88 S.Ct. 1231, 20 L.Ed.2d 132 (1968) (§ 241 and 1964 Public Accommodations Act); *cf. Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 150 n. 5, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (No. § 1983 recovery for violation of Public Accommodations Act, in view of manifest Congressional intent that damage actions not be permitted. A 14th

clude that Novotny's claim under § 1985(3) is not precluded by Title VII.

## C. The Constitutionality of § 1985(3)

### (1) The Scope of the Inquiry

The defendants assert that if § 1985(3) purports to reach confederations such as the one alleged by Novotny, the statute is beyond the powers conferred upon Congress, and therefore unconstitutional. Before examining this contention, the question of the statute's constitutionality must be set in perspective.

In the first case in which the Supreme Court faced a challenge to the constitutionality of the Ku Klux Klan Act of 1871, the Court set forth its analysis in these terms:

> Proper respect for a co-ordinate branch of the government requires the courts of the United States to give effect to the presumption that congress will pass no act not within its constitutional power. This presumption should prevail unless the lack of constitutional authority to pass an act in question is clearly demonstrated.[88]

Ninety years later, in construing § 1985(3), the Court in *Griffin* was again met with the allegation that Congress had exceeded its powers in the 1871 Act. It determined the question in the negative, measuring the Act against the following standard:

> Our inquiry . . . need go only to identifying a source of congressional power to reach the private conspiracy alleged by the complaint in this case.[89]

*Griffin* gave no indication that Congress must specifically invoke a particular Constitutional authorization to allow the Court to sustain an enactment. Instead, since the presumption is in favor of constitutionality, the government need only point to an applicable fount of congressional authority.[90]

Discussion must, therefore, be directed toward ascertaining whether a source of Congressional power exists which will justify giving relief to Novotny.

### (2) *The Power of Congress*

There is little question that the Congress which passed the 1871 Act believed itself to be acting under the Fourteenth Amendment. The legislation itself was formally entitled "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes." In defending the proposal against charges of unconstitutionality, proponents of the Act found warrant in the text of the Fourteenth Amendment.

The Supreme Court recently noted in *Monell v. N. Y. C. Dept. of Social Services*,[91] that Representative Shellabarger opened his remarks introducing the Act by asserting that the Fourteenth Amendment's twin guarantees of "equal protection" and the "privileges and immunities of citizenship" should be read to protect equality in the enjoyment of life, liberty, and property. He then invoked what he regarded as a settled principle of law that "Congress has always assumed to enforce, as against the states and also persons, every one of the provisions of the Constitution." [92]

---

Amendment action under § 1983, however, is not inconsistent with Public Accommodations Act).

**88.** *United States v. Harris,* 106 U.S. 629, 635–36, 1 S.Ct. 601, 27 L.Ed. 290 (1883). The Court went on to quote with approval the comment of Mr. Justice Story:

> Whenever, therefore, a question arises concerning the constitutionality of a particular power, the first question is whether the power be expressed in the constitution. If it be, the question is decided. If it be not expressed, the next inquiry must be whether it is properly an incident to an express power and necessary to its execution. *Id.* at 636, 1 S.Ct. at 607.

**89.** 403 U.S. at 104, 91 S.Ct. at 1799.

**90.** *See, e. g., District of Columbia v. Carter,* 409 U.S. 418, 424–25, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973) (extension of § 1983 to guard against deprivation under color of territorial law presumed to be an exercise of Article IV power to regulate territories); *Examining Board v. Flores de Otero,* 426 U.S. 572, 582–83, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976) (*semble*).

**91.** 436 U.S. 658–670, 98 S.Ct. 2018, 56 L.Ed. 2d 611 (1978).

**92.** *Id.*

It was not without a certain sense of poetic justice that Representative Shellabarger adduced support for this proposition. For the cases sustaining the fugitive slave laws enacted by Congress prior to the Civil War, beginning with *Prigg v. Pennsylvania,* rested their holdings on the proposition that the Fugitive Slave clause of the Constitution,[93] though on its face addressed to "laws and regulations" of states, empowered the federal government to adopt legislation binding on individuals.[94] Shellabarger declared that it could not "now be endured" that

> those decisions which were invoked and sustained in favor of bondage shall be stricken down when first called upon and

invoked in behalf of human rights and American citizenship.[95]

Although it appears that at the time he propounded it, Shellabarger's argument was supported by the weight of legal precedent,[96] subsequent litigation demonstrated the Supreme Court's reluctance to apply the principle of *Prigg* to legislation enacted in reliance on the Fourteenth Amendment. Without dealing squarely with the fugitive slave law cases,[97] the Supreme Court erected a barrier preventing the application of legislation implementing the Fourteenth Amendment to activities not infused with "state action."[98]

The last two decades have brought a substantial erosion of that barrier.[99] And in

93. *Prigg v. Pennsylvania,* 41 U.S. (16 Pet.) 539, 10 L.Ed. 1060 (1842); *see, e. g., Ableman v. Booth,* 62 U.S. (21 How.) 506, 10 L.Ed. 169 (1859). *See generally* R. Cover, Justice Accused; Antislavery and the Judicial Process 159–191 (1975).

94. Art. IV § 2 cl. 3:
No Person held to Service or Labour in one State, under the Laws thereof, escaping into another, shall, in Consequence of any Law or Regulation therein, be discharged from such Service or Labour, but shall be delivered up on Claim of the Party to whom such Service or Labour may be due.

95. *Cong.Globe* App. 70. The refrain was taken up by others in both the House and Senate: *e. g.* Representative *Sumner, Cong.Globe* 651 ("As in other days Slavery gave its Character to the Constitution, filling it with its own denial of Equal Rights and Compelling the National government to be its instrument, so now do I insist that Liberty must give its Character to the Constitution.")
Representative Platt (*id.* App. 183–84) ("I presume this power will not be questioned by gentlemen on the other side representing the Democratic Party. . . . They found enough power in the Constitution to compel every man in every state in the Union to assist in enforcing the United States laws . . . compelling them by United States law and in defiance of State Laws to assist in returning fugitives to slavery . . . ."). Senator Lowe, *id.* 375 ("If such was the law announced by the tribunal of the last resort in reference to the rendition of fugitive slaves, shall a less liberal construction be allowed in reference to a similar constitutional provision in favor of civil rights and personal security?"). *See generally, Avins, supra* note 33.

96. This conclusion was arrived at by commentators as divergent as Laurent Frantz, *Congres-*

*sional Power to Enforce the Fourteenth Amendment Against Private Acts,* 73 Yale L.J. 1353, 1357 (1964) and Prof. Raoul Berger, Government By Judiciary, The Transformation of The Fourteenth Amendment 225–27 (1977). But cf. Bickel, *The Original Understanding and the Segregation Decision,* 69 Harv. 1, 60 and n. 115 (suggesting that, despite statements to the contrary by the draftsman of the 14th Amendment, the legislative history indicates that Congress was not to have the latitude provided in the Necessary and Proper clause); Note, *Theories of Federalism & Civil Rights,* 75 Yale L.J. 1007, 1045–46 and n. 200 (1966) (suggestion that § 5 is narrower than the Necessary and Proper clause, and therefore *Prigg* may be distinguished).

97. It is unclear whether the Court was faced with the fugitive slave cases in *Harris* or *Cruikshank,* but the *Prigg* case was argued to the Court in the *Civil Rights Cases,* 109 U.S. 3, 7, 3 S.Ct. 18, 27 L.Ed. 835 (1883); and Justice Harlan made considerable use of it in his dissent, *id.* 28–35, 50–54. The majority, however, declined to mention *Prigg* and its progeny.

98. *E. g. United States v. Cruikshank,* 92 U.S. 542, 23 L.Ed. 588 (1876); *United States v. Harris,* 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290 (1883); *Civil Rights Cases,* 109 U.S. 3 (1883); *see generally, Commonwealth of Pennsylvania v. Local Union No. 542,* 347 F.Supp. 268, 291–94 (E.D.Pa.1972) (Higginbotham, J.) and sources cited therein; Note, *Federal Power to Regulate, supra* note 10 at 452–460.

99. *See e. g. District of Columbia v. Carter,* 409 U.S. 418, 424 n. 8, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973); *United States v. Guest,* n. 100 *infra. United States v. Price,* 383 U.S. 787, 797–807, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966); *Heart of*

*United States v. Guest* a majority of the Court expressed the opinion that

> the specific language of § 5 [of the 14th Amendment] empowers the Congress to enact laws punishing all conspiracies—with or without state action—that interfere with Fourteenth Amendment rights.[100]

In *Griffin,* however, the Supreme Court declined to rely on the Fourteenth Amendment in upholding the power of Congress to enact § 1985(3), and no Supreme Court case has attempted to chart the limits of § 5 since that time. Inasmuch as we need not rest on the Fourteenth Amendment to justify the application of § 1985(3) to this case, it is not necessary at this time to resolve the scope of its Fourteenth Amendment foundation.[101]

█ The plaintiff alleges a conspiracy to deprive women employed by GAF of their equal employment rights in violation of Title VII. We do not understand the defendants to challenge the power of Congress to prohibit employment discrimination by employers like GAF. Nor could such a challenge be plausibly made, for prohibition of such discrimination falls clearly within the range of Congressional authority under the commerce clause.[102] The same authority which warrants the provision of such rights in the first place equally empowers Congress to provide sanctions against conspiracies to interfere with the equal enjoyment of rights under Title VII.[103] Thus, as ob-

---

*Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 279–286, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (opinion of Douglas, J. concurring) *id.* 291–93, 85 S.Ct. 348 (opinion of Goldberg, J. concurring); *Action v. Gannon,* 450 F.2d 1227, 1233–37 (8th Cir. 1971) (en banc) (and materials cited therein); *Commonwealth of Pennsylvania v. Local Union No. 542,* 347 F.Supp. 268, 294–97 (E.D.Pa.1972) (Higginbotham, J.) (and materials cited therein); *see generally Cox, supra* note 57 at 108–120.

**100.** 383 U.S. 745, 762, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966) (opinion of Clark, J., joined by Black and Fortas, JJ.); *id.* at 782, 86 S.Ct. 1170 (opinion of Brennan, J. joined by Warren, Ch. J. and Douglas, J.). *See, e. g., Cox, supra* note 57 at 108–20; Note, *Theories of Federalism, supra* note 96, at 1043–49 (1966).

**101.** Defendant asserts that the opinions of Judge (now Justice) Stevens; for the Seventh Circuit in *Dombrowski v. Dowling,* 459 F.2d 190 (7th Cir. 1972) and *Cohen v. Ill. Ins. Tech.,* 524 F.2d 818 (7th Cir. 1975) *cert. denied* 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976), are adverse to the assertion of the 14th Amendment as a basis for § 1985(3) as it applies to private action.

As we read those cases, however, they adopt the position that § 1985(3) "requires consideration of the state action issue in cases bottomed on an alleged violation of the Fourteenth Amendment," 524 F.2d at 829. That is, when the plaintiff asserts that the "right or privilege" or "protection of the law" (see part II(B)(2)(a) *supra*) impinged upon is the right to equal protection guaranteed by the bare terms of § 1 of the 14th Amendment, state involvement must be present because § 1 *ex proprio vigore* is addressed to the states. Such a statutory construction, even if accepted, however, does not resolve the question whether the enforce-

ment clause of the 14th Amendment authorizes the application of § 1985(3) to invidious discrimination on the part of private individuals which deprives persons of rights or privileges secured by state or federal laws or constitutional provisions other than the 14th Amendment. *Cf.* cases cited n. 61 *supra.*

**102.** *See e. g. Daniel v. Paul,* 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969); (Title II of 1964 Civil Rights Act is sustainable under Commerce Power); *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) *(semble); Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) *(semble); Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (upholding farm quota legislation under Commerce Power); *NLRB v. Fainblatt,* 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014 (1939) (upholding NLRA under Commerce Power); *United States v. Darby,* 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941) (upholding Fair Labor Standards Act under Commerce Power).

Title VII 42 U.S.C. 2000e et seq. applies to "persons engaged in an industry affecting commerce." § 2000e(b). And Section 701(b) of the 1964 Civil Rights Act states Congress' conclusion that Title VII is necessary to remove obstructions to the free flow of interstate and foreign commerce.

**103.** Indeed the original proponents of the Ku Klux Klan Act did not base their claim of power entirely on the Fourteenth Amendment. *See, e. g.,* remarks of Rep. Shellabarger, *Cong. Globe* 477–78 (referring to amendment to § 2 "so far as it is not confined to infractions of rights which are clearly independent of the Fourteenth Amendment, referable to and sustained by the old provisions of the Constitution"); Remarks of Rep. Bingham, *id.* at App. 81 ("It was always competent for the Congress

served earlier, in 1885 the Court, in *United States v. Waddell,*[104] upheld a prosecution under § 1985(3)'s criminal counterpart, 18 U.S.C. § 241,[105] for a conspiracy to harass and attack a homesteader exercising rights conferred by Congress through legislation authorized by Article IV Section 3.[106] In rejecting the argument that the legislation was unconstitutional, the Court said:

> Whenever the acts complained of are of a character to prevent [exercise of a statutory right] or throw obstruction in the way of exercising this right, and for the purpose and with intent to prevent it . . . because it is a right asserted under the law of the United States and granted by that law, those acts come within the purview of the statute and of the constitutional power of congress to make such statute.[107]

Eighty years later in *United States v. Johnson,*[108] also discussed above, the Supreme Court reversed the dismissal of an indictment under § 241 of "hoodlums" who conspired to assail black persons for exercising their right to equality of public accommodations under the 1964 Civil Rights Act.

In the interim, the Supreme Court decided no case casting doubt on the constitutional power of Congress to provide sanctions for the interference by private parties with rights conferred by a validly enacted federal statute, and we are aware of no recent decisions doing so.[109]

■ We therefore conclude that § 1985(3) may protect a plaintiff injured by acts done in furtherance of a conspiracy to violate the rights of female employees under Title VII without exceeding Congress' powers under the commerce clause.[110]

### D. *Conspiracy*

The final salvo launched by the defendants against Novotny's § 1985(3) count, and the one that succeeded in the district court, finds its basis in the theory that the defendants are immune to suits under § 1985(3) because the alleged combination occurred among officers and directors of a single corporation.

Defendants do not appear to challenge the fact that, while not artfully pleaded, the

---

of the United States by law to enforce every affirmative grant of power. . . .").

**104.** 112 U.S. 76, 5 S.Ct. 35, 28 L.Ed. 673 (1884).

**105.** *Supra* note 63.

**106.** 112 U.S. at 79, 5 S.Ct. at 35.

**107.** *Id.* at 80, 5 S.Ct. at 37.

**108.** 390 U.S. 563, 88 S.Ct. 1231, 20 L.Ed.2d 132 (1968).

**109.** Between 1884 and 1968 prosecutions under § 241 were sustained in vindication of the right to vote, *United States v. Classic,* 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); the right to travel, *United States v. Guest,* 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); the right to be free of violence while in the custody of a federal marshal, *Logan v. United States,* 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892); the right to have one's vote counted, *United States v. Mosely,* 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355 (1915).

It should also be noted that litigation under § 241 establishes that the right of a citizen of the United States to inform the government of violation of federal laws can constitutionally be protected by federal legislation. *Motes v. United States,* 178 U.S. 458, 462, 20 S.Ct. 993, 44

L.Ed. 1150 (1900) ("It was the right and privilege of Thompson [who was shot by the defendants], in return for the protection he enjoyed under the Constitution and laws of the United States, to aid in the execution of the laws of his country by giving information to the proper·authorities of violations of those laws. That right and privilege may properly be said to be secured by the Constitution and laws of the United States"). *See In re Quarles,* 158 U.S. 532, 15 S.Ct. 959, 39 L.Ed. 1080 (1895). The same principle may also extend to protect the right to attempt to persuade others to comply with the laws of the United States.

**110.** It has also been suggested that Congress may reach private discrimination against women under its Thirteenth Amendment enforcement power. Note, *Federal Power to Reach Private Discrimination, supra* note 10 at 505. *.Cf. McDonald v. Santa Fe Rail Transp. Co.,* 427 U.S. 273, 285–296, 96 S.Ct. 2574, 49 L.Ed.2d 493 (42 U.S.C. § 1981, enacted under the 13th Amendment protects whites against racial discrimination); *Graham v. Richardson,* 403 U.S. 365, 377, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (aliens protected by § 1981).

Since the application of § 1985(3) to this case finds ample support in the commerce clause, however, we need not reach this argument.

complaint adequately sets forth the claim that Novotny was victimized by a conspiracy.[111] Rather, the defendants maintain that their alleged concerted action was taken in their official capacities as officers and directors of GAF,[112] and therefore cannot legally be deemed a combination within the terms of § 1985(3).

This contention finds no support in the language of § 1985(3). On its face, the statute requires simply that "two or more persons" conspire in order to come within its proscription.[113] Similarly, we can discern no basis for the defendants' argument in the legislative history of § 1985(3).

Nor does defendants' suggestion have solid roots in the general tenets of conspiracy theory. It is true that a conspiracy requires a plurality of legal personalities as one of its elements. For example, at common law a husband and wife could not conspire, since they constituted a single personality in the eyes of the law.[114] But it is well-settled that an employer can conspire with his employee,[115] and the Supreme Court has held that a labor union can conspire with its business agent.[116] The assertion of the defendants must therefore be that incorpora-

tion confers on corporate employees an immunity from liability under § 1985(3).

We see nothing in the policies undergirding § 1985(3) that would support such an argument. If, as seems clear under § 1985(3), the agreement of three partners to use their business to harass any blacks who register to vote constitutes an actionable conspiracy, we can perceive no function to be served by immunizing such action once a business is incorporated.

The defendants place primary reliance on the legal precept that a corporation cannot conspire with its officers because a person cannot conspire with himself.[117] Under this precept, they argue, no conspiracy exists in this case because the defendants were all officers and directors of a single corporation, and the actions injuring Novotny were taken in the course of their duties as such.

■ As we read Novotny's complaint, however, it does not allege that the corporate entity, GAF, conspired with its officers and directors to his detriment. In defining his cause of action under § 1985(3), Novotny alleges that his termination was accomplished "by the individual defendants in

---

**111.** The complaint alleges that the individual defendants "embarked upon and pursued a course of conduct the effect of which was to deny" equal employment rights, ¶ 16, and that the "course of conduct constitutes an ongoing discrimination." ¶ 18 Novotny further alleged that he was injured "as a result of the conspiracy by the individual defendants," and sets forth the manner in which the joint action of the defendants allegedly injured him. ¶¶ 30, 31, 32. Such a complaint adequately alleges a conspiracy for purposes of a Rule 12(b)(6) motion. *See Weise v. Syracuse University*, 522 F.2d 397, 408 (2d Cir. 1975) ("Sketchy" conspiracy allegations are sufficient where "action by the defendants collectively, in concert, and with invidious intent" is alleged); *Marlowe v. Fisher Body*, 489 F.2d 1057 (6th Cir. 1973) (allegation of "collusion" adequately raises issue of conspiracy).

**112.** Novotny indeed pleads that the individual defendants acted on behalf of GAF. Complaint: 33.

**113.** And the Supreme Court noted in *Griffin* that "The approach of this Court to other Reconstruction civil rights statutes . . . has been to 'accord [them] a sweep as broad as

[their] language.'" 403 U.S. at 97, 91 S.Ct. at 1796.

**114.** 1 Hawkins, Pleas of the Crown 351 (6th Ed. 1788). *Cf. United States v. Dege*, 364 U.S. 51, 80 S.Ct. 1589, 4 L.Ed.2d 1563 (1960) (repudiating this principle).

**115.** *See, e. g., Hyde v. United States*, 225 U.S. 347, 367–68, 32 S.Ct. 793, 56 L.Ed. 1114 (1912).

**116.** *See Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 465, 41 S.Ct. 172, 65 L.Ed. 349 (1921).

**117.** The fountainhead of this precept is *Nelson Radio & Supply Co. v. Motorola Inc.*, 200 F.2d 911, 914–15 (5th Cir. 1952). In *Nelson*, an antitrust action, the plaintiffs alleged a conspiracy between the defendant corporation and its employees, but named only the corporation as a defendant. The Fifth Circuit dismissed the suit.

In *Johnston v. Baker*, 445 F.2d 424 (3d Cir. 1971), a panel of this Court characterized our earlier approval of *Nelson* in *Goldlawr, Inc. v. Shubert*, 276 F.2d 614 (3d Cir. 1960) as *dictum* and declined "to pass on the viability of" the *Nelson* doctrine.

violation of" § 1985(3).[118] There is thus no occasion to evaluate the force of the proposition that a corporation cannot conspire with itself. Rather, the sole issue before us, so far as the conspiracy element is concerned, is whether concerted action by officers and employees of a corporation, with the object of violating a federal statute, can be the basis of a § 1985(3) complaint.

In *Mininsohn v. United States*,[119] Jacob and Max Mininsohn, the officers of Interstate Lumber Company, a corporation, caused the company to deliver underweight bags of cement to a government construction project. Jacob Mininsohn and Interstate were charged with violation of legislation prohibiting conspiracies to defraud the United State Government. On appeal, it was alleged that the evidence was insufficient to convict Jacob Mininsohn. Judge Biggs had no difficulty in concluding that "the acts of the appellant and his brother were such as indicated the existence of a conspiracy to defraud the United States."[120] This determination is in accord with a well-established line of precedent

holding that, at least outside of the area of antitrust law,[121] where a corporation commits a substantive crime, the officers and directors who cause it to so act may be guilty of criminal conspiracy.[122]

Similarly, the sole Supreme Court decision to shed direct light on the issue before us undercuts the defendants' position. In *Pennsylvania RR. System & Allied Lines Fed. No. 90 v. Pennsylvania RR. Co.*,[123] a labor union brought suit against an employer and its officers, claiming that under the predecessor to 18 U.S.C. § 241, the actions of the corporation and officers in resisting the recommendations of an arbitration board under the Railway Labor Act constituted a conspiracy to "injure, oppress, threaten, or intimidate any person in the free exercise or enjoyment of" a federal right or privilege. The Supreme Court's opinion expressed no doubts regarding the viability of a conspiracy composed of corporate officers. Rather it stated that "The whole issue . . . is whether the provisions of Title III, in pointing out what

---

**118.** ¶ 28. Similarly, ¶¶ 30, 31 and 32 refer to a conspiracy "by the individual defendants."

**119.** 101 F.2d 477 (3d Cir. 1939).

**120.** *Id.* at 478. The only point deemed worthy of legal analysis was whether the corporation could be found guilty of conspiracy. Judge Biggs concluded that such a conviction was in accord with "well settled law." *Id.*

**121.** A distinct line of precedent has developed regarding "conspiracies or combinations in restraint of trade" violating the Sherman Antitrust Act, 15 U.S.C. § 1, and the conditions under which a corporation can be considered to have combined or conspired with its officers or subsidiaries. *See Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20 at 33 n. 49 (3d Cir. 1978) and cases and sources cited therein.

The considerations which shape this antitrust doctrine, rooted in the tension between the policy of preserving and fostering competition and the interest in not intermeddling unnecessarily in the internal entrepreneurial decisions of companies, do not lie parallel to the balance of concerns embodied in § 1985(3). For example, while almost any decision by a corporation may have an effect on competitors, and thereby come within the potential purview of the antitrust law, *cf. Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed.

683 (1918), only a limited number of decisions will impact on "equal protection" and "equal privileges and immunities." Conversely, while courts have interpreted economic efficiencies and pro-competitive effects to constitute justifications for certain restraints of trade we discern no indication that similar defenses would protect a conjuration to deprive a minority of equal rights.

**122.** *See Egan v. United States*, 137 F.2d 369 (8th Cir.) *cert. denied* 320 U.S. 788, 64 S.Ct. 195, 88 L.Ed. 474 (1943) (conspiracy to make illegal political contribution); *Barron v. United States*, 5 F.2d 799, 799–801 (1st Cir. 1925) (conspiracy to conceal assets of bankrupt corporation); *United States v. Kemmel*, 160 F.Supp. 718, 720–21 (E.D.Pa.1958) (conspiracy to defraud the United States; collecting cases); W. LaFave & A. Scott, Handbook on Criminal Law 491 (1972); Sullivan, Antitrust Law 324 (1977); *Developments in the Law—Criminal Conspiracy*, 72 Harv.L.Rev. 920, 952–53 (1959) (approving this line of cases. In the case of conspiracy among corporate officers, "conditions which constitute the essence of conspiracy rationales are present to the same extent as if the same persons combined their resources without incorporation").

**123.** 267 U.S. 203, 45 S.Ct. 307, 69 L.Ed. 574 (1925).

Congress wished the parties to the dispute to do, was intended by Congress to be a positive, obligatory law . . . ."[124]

Thus, since neither considerations of policy nor force of precedent require adherence to the defendants' stance, we do not follow the line of cases adopting the rule that concerted action among corporate officers and directors cannot constitute a conspiracy under § 1985(3).[125]

## III. TITLE VII

As an alternative to seeking relief under § 1985(3), Novotny sets forth a claim under § 704(a) of Title VII.[126] That section provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Plaintiff maintains that his discharge because of expressed hostility toward the denial of equal employment opportunity to women in GAF, and his refusal to support the company in its allegedly discriminatory dealings with Batis constitutes a discrimination against him "because he has opposed [a] practice made an unlawful employment practice," in violation of § 704(a).

Defendants argue, however, that in order to constitute protected opposition within the meaning of the statute, an employee's antipathy to an unlawful employment practice must be manifested through involvement with formal charges or litigation under Title VII. The construction advocated by the defendants was adopted by the district court in the course of its order dismissing the complaint.

Such an interpretation, however, does not emerge from the text of the statute. On its face, § 704(a) refers to two distinct situations: first, those in which an employee has "opposed" any unlawful employment practice, and second, those in which he or she has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.[127] The clauses referring to the two scenarios are connected by a disjunctive "or," and to construe the statute as the defendants suggest would render the first clause mere surplusage.

Nonetheless, the defendants claim that the legislative history negates what appears

---

**124.** *Id.* at 210, 45 S.Ct. at 309.

**125.** *See Herrmann v. Moore*, 576 F.2d 453 (2d Cir. 1978); *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66 (2d Cir.) *cert. denied* 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976); *Bellamy v. Masons Stores Inc.*, 508 F.2d 504 (4th Cir. 1974) (concurring opinion); *McLellan v. Mississippi Power & Light*, 545 F.2d 919 (5th Cir. 1977) (dissenting opinion); *Baker v. Stuart Broadcasting Co.*, 505 F.2d 181, 183 (8th Cir. 1974); *Dombrowski v. Dowling*, 459 F.2d 190 (7th Cir. 1972) (Stevens, J.). We note that both *Dombrowski* and *Baker* limited their holdings to situations involving "a single act of discrimination by a single business entity." *Cf. Cohen v. Ill. Inst. of Technology*, 524 F.2d 818 (7th Cir. 1975) *cert. denied* 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976) (Stevens, J.) (pretermitting question of whether an institutional policy would make out a conspiracy); *Rackin v. Univ. of Pennsylvania*, 386 F.Supp. 992 (E.D.Pa.1974) (allegation of ongoing policy of harassment and discrimination made *Dombrowski* inapposite). Thus, even under *Baker* and *Dombrowski* a

finding of conspiracy is not excluded in the case before us, since Novotny alleges an eight year program of denial of equal opportunity.

**126.** 42 U.S.C. 2000e–3(a). It may be that, in this case, the cause of action under § 1985(3) contains the same elements as a Title VII claim. However, depending on particular factual settings, claims under the two statutes arising out of the same act might involve varying measures of damages, different statutes of limitations, or other variations. Moreover, § 1985(3) would protect against actions taken to coerce nonemployees (*e.g.* customers) to the detriment of Title VII rights (*e. g.* of a customer's employees), where as Title VII gives no such shield. Since, however, the extent of the over-lap between Title VII and § 1985(3) was not briefed or explored at oral argument, we do not address the matter further.

**127.** *See Hicks v. Abt. Associates, Inc.*, 572 F.2d 960, 968–69 (3d Cir. 1978) (distinguishing "opposition" and "participation" clauses).

to be the clear meaning of the section. In summarizing the import of § 704(a), the Committee Reports in both House and Senate referred only to discrimination in retaliation for participation in Title VII proceedings.[128] We find such legislative history inconclusive on this point. While it does not support the contention that the first clause of § 704(a) protects activities which the second does not, neither does it affirmatively state that such was not the intent of Congress.

As Justice Frankfurter has observed, "The troublesome phase of construction is the determination of the extent to which extraneous documentation and external circumstances may be allowed to infiltrate the text on the theory that they were part of it, written in ink visible to the judicial eye." [129] Here, the hues of the cited history are not sufficiently bold as to overwhelm the clear terms of § 704(a) itself. In view of the "high priority" that Congress has given to the effort to eliminate employment discrimination,[130] we are unwilling to withdraw protection from opponents of illegal discrimination through a constricted statutory construction.

The Supreme Court has not yet delimited the scope of the "opposition" that § 704(a) will be held to safeguard,[131] and the bulk of cases under § 704(a) have involved alleged retaliation for complaints or litigation under Title VII.[132] Nonetheless, several courts of appeals have understood § 704(a) to reach beyond protecting participation in Title VII procedures.

In *Hicks v. Abt Assoc.*,[133] this Court held a complaint to the Department of Housing and Urban Development regarding alleged employment discrimination in a project which it funded to constitute "opposition" within the terms of the statute. Likewise, in *Green v. McDonnell Douglas Corp.*,[134] the Eighth Circuit, while rejecting protection for unlawful activities, stated: "Those who have the courage to challenge discriminatory practices of an employer merit [statutory] protection. Without doubt, lawful protest also commands the same protection. . . . ." And, while in *Pettway, supra* the Fifth Circuit concentrated on the protection afforded to Title VII complainants, in *Bald-*

128. H.Rep.No.914, 88th Cong. 2d Sess. pt. 7 at 27–28 *reprinted* 1964 U.S.Code Cong. & Admin. News 2391, 2403 (referring to identically worded provision in House Bill); S.Rep.No.867, 88th Cong. 1st Sess. 17 (1964) (referring to § 4(c) of S. Bill 1937).

129. Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum.L.Rev. 527, 529 (1947).

130. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47–48, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).
 The defendants also point to the comparable anti-retaliation provisions in the National Labor Relations Act 29 U.S.C. § 158(a)(4) and Fair Labor Standards Act 29 U.S.C. § 215(a)(1), (3), which protect only complaints of statutory violations made through the administrative channels established by the legislative scheme. They suggest that any divergence from the approach of the FLSA and NLRA would have evoked comment in the legislative history, and that the lack of such comment negatives the possibility of protection for self-help remedies. We are not persuaded by this inference. As the Fifth Circuit noted, the language of the Title VII provision is broader than that of the FLSA and NLRA, and in general "the differences between those Acts and Title VII may well outnumber the similarities." *Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 1006 (5th Cir.

1969). For example, the structure of Title VII has been held explicitly to contemplate multiple avenues for relief, without either preemption or primary jurisdiction vesting in the EEOC. *See Gardner Denver, supra*, 415 U.S. at 48, 94 S.Ct. 1011.

131. *See Emporium Capwell Co. v. Community Org.*, 420 U.S. 50, 71 n. 25, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975) (declining to resolve issue); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 797 n. 6, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (issue not appealed).

132. *E.g. Rutherford v. American Bank of Commerce*, 565 F.2d 1162 (10th Cir. 1977); *Corley v. Jackson Police Dept.*, 566 F.2d 94 (5th Cir. 1978); *Adams v. Reed*, 567 F.2d 1283 (5th Cir. 1978); *Brown v. Ralston Purina Co.*, 557 F.2d 570 (6th Cir. 1977); *Dawkins v. Nabisco, Inc.*, 549 F.2d 396 (5th Cir.) *cert. denied* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977); *Smith v. Rexall Drugs*, 548 F.2d 762 (8th Cir. 1977).

133. 572 F.2d 960 (3d Cir. 1978).

134. 463 F.2d 337, 341 (1972), *not challenged or appealed on this point*, 411 U.S. 792, 797 n. 6, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

*eras v. LaCasita Farms, Inc.,*[135] another panel of that Circuit declared that an element of an action under § 704(a) is "discrimination based upon the employee's opposition to unlawful practices," as manifested in "civil rights activities."[136]

We recognize that to construe § 704(a) as protecting "opposition" beyond that embodied in participation in Title VII proceedings carries with it the prospect of a greater burden of litigation for employers than the interpretation urged by the defendants. Indeed, it may present the danger of harassment by employees who suffer some imagined slight based on a chance remark. Yet these dangers are implicit in any decision to recognize legal rights; to decrease the pressure of litigation on employers by the simple expedient of refusing to protect employees is always an option. Congress, however, has passed legislation extending the shield of Title VII to "opposition," and the possibility of abuse by litigious plaintiffs cannot justify withdrawal of that bulwark.

Rather, the courts must rely upon the procedures that are used to weed out frivolous claims under any statute. If, on a motion for summary judgment, Novotny cannot come forward with support for his contention that he opposed the denial of equal employment opportunities by GAF, or that he was terminated as a result of such opposition, of course his claim cannot be sustained. Such a determination, however, is for the district court after proper opportunity for discovery.

Likewise, this opinion does not suggest that opposition to employer violations of Title VII confers an irrevocable tenure on the opponent. Clearly, illegal actions would be grounds for discharge,[137] as would activities that unreasonably interfere with the employer's legitimate interests.[138] As the First Circuit has stated, in situations of "opposition" in the form of self-help "courts have in each case to balance the purpose of the Act to protect persons engaging reasonably in activities opposing . . . discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel."[139] But such matters are issues for defense, and it is inappropriate to resolve them on a motion to dismiss.

## IV. CONCLUSION

The questions with which we have dealt have been in large measure matters of statutory construction, replete with the ambiguities that legislative enactments on occasion engender. The Ku Klux Klan Act of 1871 was adopted to deal with a pressing problem of Reconstruction; yet its commands were couched in expansively drafted legislation, whose provisions are now, not implausibly, called upon to traverse a century of social, economic and political development to come to the aid of human rights. The Civil Rights Act of 1964, though more tightly and technically constructed, and more recent in origin, confronts us with the duty of reconciling an explicit statutory mandate with an opaque legislative history.

There is material from which defendants can argue the inapplicability of both statutes to this case. Narrowly construed, either enactment could fall well short of providing the plaintiff a cause of action. But the statutory landscape is illuminated by the community's goals as well as the ema-

---

**135.** 500 F.2d 195 (1974).

**136.** *Id.* 198–99.

**137.** *Green v. McDonnell-Douglas Corp.,* 463 F.2d 337, 341 (8th Cir. 1972) *upheld on this point for lack of appeal; McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 797 n. 6, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ("Nothing in Title VII compels an employer to absolve and rehire one who has engaged in such deliberate, unlawful activity against it.") *See id.* at 803, 93 S.Ct. 1817, 1825.

**138.** *See Emporium Capwell Co. v. Community Org.,* 420 U.S. 50, 69, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975) (rights under Title VII "cannot be pursued at the expense of the orderly collective-bargaining process contemplated by NLRA").

**139.** *Hochstadt v. Worcester Foundation Inc.,* 545 F.2d 222, 231 (1st Cir. 1976). *See also Ammons v. Zia Co.,* 448 F.2d 117 (10th Cir. 1971) (Aldisert, J.).

nations of legislative history. To hobble the legislation before us would without justification, set judicial authority against the effort to achieve equality of rights. We do not believe such was the intent of the Congressmen who in the aftermath of the Civil War began the task nor of their successors in 1964 who mandated its continuance. With this in mind, we have concluded:

(1) That § 1985(3) protects against conspiracies motivated by discriminatory animus against women.

(2) That a male injured in furtherance of such a conspiracy has standing to bring an action under § 1985(3).

(3) That collusive action to deprive women of equal employment opportunities in violation of Federal law would be conspiracy to deprive of "equal privileges and immunities" in violation of § 1985(3).

(4) That a cause of action under § 1985(3) grounded on such a conspiracy is not precluded by Title VII.

(5) That as applied to such a conspiracy by private employers § 1985(3) does not exceed Congress' constitutional authority under the commerce clause.

(6) That individuals who are directors and officers of a corporation can form a conspiracy in violation of § 1985(3); and

(7) That § 704(a) of Title VII prohibits retaliation against employees for reasonable opposition to unlawful employment discrimination even when such opposition is not manifested through participation in Title VII proceedings.

The judgment of the district court will be reversed and the case remanded for proceedings consistent with this opinion.

## APPENDIX

### SECTION 2 OF THE KU KLUX KLAN ACT OF 1871

[Portions Later Recodified as § 1985(3) are Underscored]

Sec. 2. *That if two or more persons within any State or Territory of the United States shall conspire together* to overthrow, or to put down, or to destroy by force the government of the United States, or to levy war against the United States, or to oppose by force the authority of the government of the United States, or by force, intimidation, or threat to prevent, hinder, or delay the execution of any law of the United States, or by force to seize, take, or possess any property of the United States contrary to the authority thereof, or by force, intimidation, or threat to prevent any person from accepting or holding any office or trust or place of confidence under the United States, or from discharging the duties thereof, or by force, intimidation, or threat to induce any officer of the United States to leave any State, district, or place where his duties as such officer might lawfully be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or to injure his person while engaged in the lawful discharge of the duties of his office, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duty, or *by force, intimidation, or threat to deter any party or witness in any court of the United States from attending such court, or from testifying in any matter pending in such court fully, freely, and truthfully, or to injure any such party or witness in his person or property on account of his having so attended or testified, or by force, intimidation, or threat to influence the verdict, presentment, or indictment, of any juror or grand juror in any court of the United States, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or an account of his being or having been such juror,* or shall conspire together, or go in disguise upon the public highway or upon the premises of another for the purpose, either directly or indirectly, of depriving any person or any class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of any State from giving or securing to all persons within such State the equal protection of the laws, or *shall conspire together for the pur-*

pose of in any manner, impeding, hindering, obstructing, or defeating the due course of justice in any State or Territory, with intent to deny to any citizen of the United States the due and equal protection of the laws, or to injure any person in his person or his property for lawfully enforcing the right of any person or class of persons to the equal protection of the laws, or by force, intimidation, or threat to prevent any citizen of the United States lawfully entitled to vote from giving his support or advocacy in a lawful manner towards or in favor of the election of any lawfully qualified person as an elector of President or Vice-President of the United States, or as a member of the Congress of the United States, or to injure any such citizen in his person or property on account of such support or advocacy each and every person so offending shall be deemed guilty of a high crime, and, upon conviction thereof in any district or circuit court of the United States or district or supreme court of any Territory of the United States having jurisdiction of similar offences, shall be punished by a fine not less than five hundred nor more than five thousand dollars, or by imprisonment, with or without hard labor, as the court may determine, for a period of not less than six months nor more than six years, as the court may determine, or by both such fine and imprisonment as the court shall determine. And if any one or more persons engaged in any such conspiracy shall do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby any person shall be injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the persons so injured or deprived of such rights and privileges may have and maintain an action for the recovery of damages occasioned by such injury or deprivation of rights and privileges against any one or more of the persons engaged in such conspiracy, such action to be prosecuted in the proper district or circuit court of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts under the provisions of the act of April ninth, eighteen hundred and sixty-six, entitled "An act to protect all persons in the United States in their civil rights, and to furnish the means of their vindication." (Emphasis added.)